UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

APRIL OWENS,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 18-cv-01204-DMR

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 27, 28

Plaintiff April Owens moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Owens not disabled and therefore denied her application for benefits under Title XVI of the Social Security Act, 42 U.S.C. § 401 et seq. [Docket No. 27.] The Commissioner cross-moves to affirm. [Docket No. 28.] For the reasons stated below, the court grants Owens's motion in part and denies it in part and remands this matter for further proceedings consistent with this opinion.

## I.  PROCEDURAL HISTORY

Owens filed an application for Supplemental Security Income ("SSI") benefits on December 30, 2013, which was initially denied on May 19, 2014 and again on reconsideration on August 4, 2014. Administrative Record ("A.R.") 182-190, 101-106, 111-116. On August 21, 2014, Owens filed a request for a hearing before an Administrative Law Judge ("ALJ"). A.R. 118-120. Owens appeared and testified at a June 14, 2016 hearing. A.R. 34-74.

After the hearing, ALJ E. Alis issued a decision finding Owens not disabled. A.R. 15-28. The ALJ determined that Owens has the following severe impairments: migraines; vertigo; affective disorder; mood disorder, not otherwise specified (NOS); cognitive disorder, NOS with borderline intellectual functioning; adjustment disorder and/or post-traumatic stress disorder (PTSD). A.R. 20. The ALJ concluded that Owens's asthma is non-severe. A.R. 20. The ALJ

found that Owens retains the following residual functional capacity ("RFC"):

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant must not work around moving mechanical parts and unprotected heights; can perform simple, routine, repetitive tasks, but not at a production rate; can make simple work-related decisions; can occasionally interact with supervisors; can occasionally interact with coworkers, but not in a tandem/team/group setting; cannot have any interaction with the public; and must work in a stable work environment, meaning few changes, if any, in the day to day work setting and in the tools and/or work processes used to accomplish tasks.

A.R. 23.

Relying on the opinion of a vocational expert ("VE") who testified that an individual with such an RFC could perform other jobs existing in the economy, including cleaner and harvest worker, the ALJ concluded that Owens is not disabled. A.R. 27-28.

The Appeals Council denied Owens's request for review on January 4, 2018. A.R. 1-6. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Owens then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II.     THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1.      At the first step, the ALJ considers the claimant's work activity, if any. If the

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2. At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3. At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4. At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5. At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III. FACTUAL BACKGROUND

### A. Owens's Testimony

Owens was 37 years old at the time of the June 2016 hearing. A.R. 36. She testified that she had just completed one week of a two-week training period to drive a van and deliver packages for Amazon. A.R. 40-41. She explained that she had applied for a full-time position and was hoping to work four ten-hour shifts per week. A.R. 42-43. Owens likes working and "staying busy," but testified that it has "to be something that interest[s] [her]," because she "get[s] bored quick or irritated fast" and "drift[s] off." However, she testified that she likes people and applied for the job because she wants to "interact with other people." A.R. 48. Owens stated that she

previously "sheltered [herself]" for many years, staying in her house and not dealing with people. Her interactions with others through her position with Amazon have gone well so far; people have been friendly and she enjoys the work. A.R. 48-49.

Prior to the position with Amazon, Owens worked for a company called Tanko Lighting as a field auditor, auditing or surveying street lights. The company sent her to finish training in different states, but she was terminated before completing 90 days in that position based on her performance. A.R. 44-45. In that position, she was expected to survey 175 to 200 poles per day, but she was unable to survey more than 75 poles per day. A.R. 56-57. Owens estimates that she called in sick due to migraines about 12 times during the less than 90 days she held that position. A.R. 57-58.

Owens testified that she tried to work for Uber as a driver but was told that her temper and performance "wasn't great" and that she was not friendly enough with people. A.R. 60. She found using the Uber application and GPS difficult, and was easily irritated by people and traffic. A.R. 60, 61.

Owens has a driver's license. She testified that she drives herself to church and to her mother's house, and occasionally drives herself to doctor's appointments. The drives to her mother's house and the doctor's appointments take less than ten minutes. Her girlfriend occasionally drives her to her doctor's appointments. In the last five years, the furthest distance she has driven herself was to visit her aunt in Tracy, which is 45 minutes away. She last drove to Tracy four to five months ago. A.R. 45-47.

Owens testified that she lives alone but her girlfriend started staying with her about eight months ago. Before that, her cousin stayed with her for about one year. A.R. 47. Owens has a dog that she feeds and takes care of, but her girlfriend takes the dog for walks. A.R. 47-48. Owens described a typical day before she started training at Amazon: she gets up, cleans her house "from top to bottom," feeds her dog, and might do yard work. She usually did not go anywhere other than the barbershop. Her girlfriend does the grocery shopping because she cannot remember what to buy. Before her girlfriend lived with her, her mother did her grocery shopping for her. She is able to buy her own groceries if she does not need to buy a lot of groceries. A.R. 49.

Owens testified that she eats "day-by-day" because she doed not like "stuff" in her refrigerator; she will not drink milk that has been open for longer than a day or eat bread that someone else has touched. A.R. 50. Owens testified that she washes her hands "all the time" and does not like touching things because she has a "phobia with bacteria," so she wears surgical gloves when she works delivering packages. A.R. 53-54.

When asked why she believes she is unable to work, Owens responded as follows: "I don't think that I'm disabled, it's just that I can't seem to stay focused enough to even keep a job." A.R. 50. She then explained that "I've been through a lot growing up and I didn't think it would take that much of a toll on my life," but that "it's like everything that I wanted to do, or had plans on doing, something always tear[s] it apart, so it never actually falls through." A.R. 50. She originally thought that she "just didn't have the right information," and so went back to school, "but that's not the issue . . . It's something as far as me staying focused on what I need to do. I can't seem to get passed [sic] that." A.R. 50-51. Owens then described the migraines that she experiences four to five days per week and which last for several hours, stating, "I can't even focus or pay attention when they come on." A.R. 51.

Owens also described the treatment she is undergoing for depression. She used to see a psychiatrist but stopped when her insurance ran out. A.R. 51. She now takes medication for her depression, which she testified helps. A.R. 51-52. The treatment and medicine help her calm down and cope with her anxiety and bacteria phobia. A.R. 54. She does not drink but has a medical marijuana card. She uses marijuana about every other week because the migraines take away her appetite. A.R. 54-56.

Owens explained that on the day prior to the hearing, she called in sick to Amazon. She had to visit the emergency room because her "chest was heavy and [she] was having pains in [her] joints." A.R. 37-38. According to Owens, she had an "asthma treatment procedure" at the hospital because she could not breathe. A.R. 59. She takes medicine for her asthma, which flares up at night and makes it difficult to sleep. She can breathe fine during the day as long as she is not running. A.R. 62-63. Owens testified that her inability to sleep at night impacts her during the day, because she has no energy. She finds it difficult to distinguish between being tired during the

day from lack of sleep or depression, but testified that her lack of energy may be due to a combination of causes.  A.R. 64.

## B.    Relevant Medical Evidence

### 1.    State Agency Medical Consultants

State agency medical consultant Paul Klein, Psy.D., reviewed the records on May 9, 2014. Dr. Klein wrote that there was insufficient evidence to substantiate Owens's allegations of anxiety and psychotic symptoms.  A.R. 81.  Another consultant, H. Bilik, Psy.D., observed that there were many inconsistencies regarding Owens's psychological evaluations, noting that she failed to mention the murder of her girlfriend to one examiner, Dr. Catlin, while it was a prominent complaint to another examiner, Dr. Howard.  Dr. Bilik did not provide an opinion regarding Owens's functional capacity.  A.R. 81-82.

Heather Barrons, Psy.D., reviewed Owens's records on July 28, 2014.  A.R. 94-95.  She noted that there were "significant inconsistencies" in Owens's records and a lack of treatment history.  A.R. 95.

### 2.    Examining Physicians

#### a.    Jonathan Howard, Psy.D.

Jonathan Howard, Psy.D., evaluated Owens on March 17, 2014.  A.R. 376-379.  Dr. Howard's evaluation included taking Owens's psychosocial, medical, and psychiatric history, behavioral observations, a clinical interview, and a mental status examination.  He also administered various tests.  *See* A.R. 376.

Dr. Howard observed that Owens appeared to be an adequate reporter.  She also appeared alert, coherent, and oriented to person, place, time, and purpose of the examination.  A.R. 376, 377.  Owens reported that she witnessed her girlfriend being killed in 1999, and stated she has flashbacks and avoids large groups.  She also discussed problems with memory and concentration. A.R. 376.

Dr. Howard administered a mental status examination.  Owens had average language comprehension and no difficulty repeating three words given verbally during the mental status exam, but could recall only two of the three words approximately five minutes later.  Her speech

6

was fluid with normal rate and volume. Eye contact appeared adequate, and her attention and concentration appeared within normal limits. Owens appeared depressed, and she reported depressed and anxious mood with sleep disturbance, tearfulness, decreased appetite, decreased energy, irritability, and difficulty with memory and concentration. While denying any suicide attempts, she reported having suicidal thoughts two weeks prior to the evaluation. Owens reported auditory hallucinations of hearing her deceased girlfriend talking since her death in 1999, but denied any other hallucinations or delusions. Her affect appeared consistent with the observed mood and her thought process appeared logical and coherent, with no overt signs of psychosis. Her insight appeared fair and judgment was good. A.R. 377.

Owens's test results indicated impaired executive functioning ability and planning, organization, and sequencing skills. Her overall cognitive abilities were moderately impaired in the borderline range. Her verbal comprehension, perceptual reasoning, working memory, and processing speed appeared moderately impaired. Dr. Howard assessed a full scale IQ of 70. A.R. 377. Owens's immediate memory and ability to learn and recall auditory information appeared severely impaired. Her ability to learn and recall visual information appeared near the bottom of the low average range. A.R. 378.

Dr. Howard diagnosed mood disorder NOS with depressed and anxious features; consider adjustment disorder and/or post-traumatic stress disorder, NOS; cognitive disorder, NOS with borderline intellectual functioning; rule out marijuana abuse/dependence. He assessed a GAF score of 57-59. A.R. 378. According to Dr. Howard, Owens demonstrated borderline intellectual functioning, slowed psychomotor ability, and difficulty shifting mental sets. He noted that it was unclear the degree to which her reported history of marijuana use and/or her mood disturbance may have contributed to her current level of functioning. A.R. 378.

Dr. Howard opined that Owens is moderately impaired in the following areas: understanding and carrying out simple instructions and tasks; attending to and concentrating on usual work situations; pace and persistence of tasks; and performing activities within a schedule and maintain regular attendance. He found that she is moderately to markedly impaired in the ability to adapt to changes in a working environment and interact effectively with supervisors, co-

7

1  workers, and the public.  Finally, he concluded that Owens is markedly impaired in the ability to

2  understand and carry out complex tasks.  A.R. 379.

3  **b.  Laura Jean Catlin, Psy.D.**

4  Laura Jean Catlin, Psy.D., evaluated Owens on April 10, 2014.  A.R. 382-390.  Dr. Catlin

5  performed a clinical interview of Owens and administered several tests.

6  Dr. Catlin noted that Owens was responsive and appeared to be a credible historian.

7  Owens reported feeling very depressed and anxious for most of her life.  She noted a history of

8  sexual abuse starting when she was 8 years old that was emotionally and physically traumatizing.

9  Since age 10, Owen has had symptoms of severe depression, suicidal ideation, and PTSD.  She

10  reported attempting suicide when she was 10 years old.  She continues to have depression and

11  PTSD as an adult.  A.R. 382, 384.  Owens reported being easily frustrated, having uncontrollable

12  angry outbursts, insomnia, nightmares, and unwanted memories of abuse.  A.R. 382-383.  She has

13  difficulty regulating her anger and problems with impulse control.  She is socially withdrawn, has

14  little contact with friends and family, mistrusts people in general, and has difficulty with

15  interpersonal relationships.  A.R. 383.

16  Owens also reported migraine headaches that last for up to a week and are unresponsive to

17  medication.  A.R. 383, 384.  She stated that she is often too depressed or in too much pain from a

18  migraine to perform household chores.  She relies on her sister to help her with activities of daily

19  living.  A.R. 383.

20  Owens was alert and oriented during the examination.  She was engaged and able to

21  sustain her attention.  A.R. 384.  Her mood was depressed and anxious and affect was flat and

22  constricted, except when talking about things that angered her.  Her thought process was logical

23  and goal oriented, and her thought content consisted of ruminations about her past sexual abuse.

24  Her insight and judgment were impaired.  A.R. 385.

25  Owens reported that she has difficulty sleeping due to nightmares.  She avoids sleep when

26  she can to avoid the nightmares, and she reported that she does not have energy to do much.  Her

27  concentration was "very poor."  A.R. 385.

28  Owens was cooperative during testing.  She seemed tense or worried and was attentive to

the tasks she was working on.  A.R. 385.  On neurocognitive testing, her score was in the borderline range.  A.R. 385.  Her immediate and delayed memory was in the borderline and impaired ranges.  Her visual/spatial abilities were moderately impaired and in the borderline range.  Her language was mildly impaired.  Attention was impaired.  A.R. 386.  Testing revealed symptoms of severe depression and high levels of anxiety, phobic anxiety, somatization, depression, and obsessive compulsive symptoms, as well as restlessness, nervousness, tension, and emotional distress.  A.R. 387.  She also displayed many symptoms of PTSD.  A.R. 387.

Dr. Catlin diagnosed major depressive disorder—severe without psychotic features and PTSD.  A.R. 388.  She opined that Owens's "ability to perform in the workplace is severely impaired."  She assessed mild impairments in the following abilities: understand and remember short and simple work-like procedures; carry out short and simple instructions; and ask simple questions or request assistance.  Dr. Catlin opined that Owens is moderately impaired in her ability to understand, remember, and carry out detailed instructions; maintain adequate pace and persistence to perform simple tasks; make simple work related decisions; and be aware of normal hazards and take appropriate precautions.  A.R. 389.

Dr. Catlin further opined that Owens is moderately to severely impaired or severely impaired in several areas: maintain attention for a two-hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; maintain adequate pace and persistence to perform complex/detailed tasks; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; adapt to changes in job routine; withstand the stress of a routine workday; accept instruction and respond appropriately to criticism from supervisors; get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; interact appropriately with coworkers, supervisors, and the public on a regular basis; travel to unfamiliar places; and use public transportation.  A.R. 389.

According to Dr. Catlin, Owens is markedly restricted in activities of daily living;

maintaining social functioning; and maintaining concentration, persistence, or pace. Owens has had six or seven episodes of decompensation within a 12-month period, each of at least two weeks duration. Dr. Catlin opined that on average, Owens's impairments will cause her to miss work more than four days per month, and her condition is expected to last at least 12 months. She also opined that Owens is not malingering. A.R. 390.

## IV.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.    ISSUES PRESENTED

Owens challenges the ALJ's decision on several grounds. She argues that the ALJ erred 1) in determining her severe impairments; 2) in failing to evaluate her impairments in combination; 3) in assessing her credibility; and 4) in evaluating the medical opinions. Owens asserts that as a result of the above errors the ALJ erred in determining her RFC and in finding that she can

perform other work in the national economy.

The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI.  DISCUSSION

### A.  Evaluation of Owens's Medical Impairments

Owens argues that the ALJ erred in finding that her asthma is not a severe impairment.

#### 1.  Legal Standard

At step two of the five-step sequential evaluation for disability claims, the ALJ must determine whether the claimant has one or more severe impairments that significantly limit a claimant's ability to perform basic work activities.  20 C.F.R. §§ 404.1520(a)(4)(ii) and (c); 416.920(a)(4)(ii) and (c).  "Basic work activities are abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (quotation omitted).  The Ninth Circuit has held that "the step-two inquiry is a de minimis screening device to dispose of groundless claims."  *Id.* (citation omitted).  "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability to work."  *Id*. (quotations omitted).  A severe impairment "must be established by objective medical evidence from an acceptable medical source," 20 C.F.R. § 416.921, and the ALJ must "consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity."  *Smolen*, 80 F.3d at 1290 (citations omitted).  In addition, when assessing a claimant's RFC, an ALJ must consider all of the claimant's medically determinable impairments, both severe and non-severe.  20 C.F.R. §§ 416.920(e), 416.945; *see Carmickle v. Comm'r, Soc. Sec. Admin*., 533 F.3d 1155, 1164 (9th Cir. 2008); *see also* SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments [because] limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.").

## 2. Analysis

The ALJ concluded that Owens has the following severe impairments: migraines; vertigo; affective disorder; mood disorder, NOS; cognitive disorder, NOS with borderline intellectual functioning; adjustment disorder and/or PTSD. A.R. 20. The ALJ discussed Owens's asthma at some length. The ALJ noted Owens's testimony that "if her chest gets tight and heavy and her inhaler does not work, she goes to the hospital" and that her asthma "flares up more at night when she tries to go to sleep." A.R. 20. The ALJ further noted that Owens testified that she "is okay during the day as long as she is not running," and wrote that Owens "had no issues with asthma while working at Tanko or Amazon," and "has had to call in sick due to being tired from not sleeping well at night and possibly tiredness due to depression." A.R. 20. The ALJ noted that "she had an asthma exacerbation in June 2016 when she ran out of her asthma medications," referring to Owen's s visit to the emergency room the day before the hearing, but observed that her asthma "generally appears to be managed with medications and does not generally flare up during the day." Therefore, the ALJ concluded, the asthma is non-severe. A.R. 20.

Owens argues that the ALJ failed to mention, and thus ignored, the following relevant, material record evidence regarding her asthma: 1) Owen's 2013 treatment for bronchitis/pneumonia, A.R. 518; 2) April 2015 treatment notes stating her asthma "symptoms currently classify for severe persistent . . .," A.R. 475; and 3) a May 2015 diagnosis of "moderate obstructive airways disease" and "probable concurrent restrictive process," A.R. 488. She argues that this evidence, along with Owens's testimony that she missed work the day before the hearing because she visited the emergency room for difficulty with breathing, demonstrate that her asthma is more than "a slight abnormality." *See Smolen*, 80 F.3d at 1290.

The court concludes that the ALJ did not err in finding that Owens's asthma is non-severe because it is managed with medication and does not flare up during the day, and that this conclusion is supported by substantial evidence. Under Ninth Circuit law, "[i]mpairments that can be controlled effectively by medication are not disabling for the purpose of determining eligibility" for benefits. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006); *see Allen v. Comm'r of Soc. Sec.*, 498 Fed. Appx. 696, 697 (9th Cir. 2012) (holding that

United States District Court
Northern District of California

plaintiff's "mental impairment cannot be considered to be severe" where "record shows [his] mental impairment can be adequately controlled by medication."). With respect to the April 2015 treatment notes describing Owens's symptoms as "severe persistent," the complete statement in the notes was "symptoms currently classify for severe persistent, *but not on appropriate meds*." *See* A.R. 475 (emphasis added). Further, although Owens had problems with her asthma in March and June 2016, including having to miss work the day before the hearing to go to the emergency room, both times she reported that she had run out of medication. A.R. 565 ("has been using her albuterol a lot and has run out"); 572 ("court and wheezing for a couple of weeks. Has asthma. Has been on Qvar but was using only 1 puff/day. Also, was on albuterol. Is out of both."). This evidence was consistent with Owens's testimony that she "can breathe all right as long as [she's] not running," and that "just moving around working, [her breathing is] okay." *See* A.R. 63. There is no evidence or medical opinion in the record indicating that Owens experiences any limitations resulting from her asthma when she is taking appropriate medication. Accordingly, substantial evidence supports the ALJ's finding that Owens's asthma was effectively controlled with medication and is therefore non-severe.

### B.  Evaluation of Medical Equivalence at Step Three

Owens next argues that the ALJ erred at the third step in failing to properly evaluate the combined effects of her impairments to determine if they equaled one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1.

### 1.  Legal Standard

At step three of the sequential evaluation process, the ALJ considers the medical severity of the claimant's impairments. If the claimant has an impairment that meets or equals one of the listings in 20 C.F.R., § Pt. 404, Subpt. P, App. 1 and meets the duration requirement, the ALJ will find that the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (emphasis in original). "To *meet* a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her

13

claim." *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) (emphasis in original). "To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment . . . ." *Id.* at 1099 (emphasis in original) (quoting 20 C.F.R. § 404.1526(a)). "If a claimant suffers from multiple impairments and none of them individually meets or equals a listed impairment, the collective symptoms, signs and laboratory findings of all of the claimant's impairments will be evaluated to determine whether they meet or equal the characteristics of any relevant listed impairment." *Id.* (citing 20 C.F.R. § 404.1526(a)). However, "'[m]edical equivalence must be based on medical findings,'" and "[a] generalized assertion of functional problems is not enough to establish disability at step three.'" *Id.* at 1100 (quoting 20 C.F.R. § 404.1526(a)).

The claimant bears the burden of establishing a prima facie case of disability under the listings. *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002); *see also* 20 C.F.R. § 404.1520(a)(4)(iii). "[I]n determining whether a claimant equals a listing under step three of the . . . disability evaluation process, the ALJ must explain adequately [the ALJ's] evaluation of alternative tests and the combined effects of the impairments." *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990). "A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not" meet or equal a listed impairment. *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001).

### 2. Analysis

Owens argues that the ALJ erred in two respects regarding the step three finding that she does not meet or equal a listing.

Owens first argues that the ALJ failed to discuss the combined effects of her impairments in concluding that Owens did not equal a listing. Even though the ALJ concluded that Owens has six or seven severe impairments, four or five of which are mental impairments[2], the ALJ's equivalence discussion was limited to analyzing the criteria of listings 12.02 (neurocognitive

---

[2] The ALJ found that Owens has the following mental impairments: affective disorder; mood disorder NOS; cognitive disorder NOS with borderline intellectual functioning; and adjustment disorder *and/or* PTSD. A.R. 20.

disorders) and 12.04 (depressive, bipolar and related disorders).  *See* A.R. 21.  The ALJ wrote that

"[t]he severity of the claimant's mental impairments, considered singly and in combination, do not

meet or medically equal the criteria of listings 12.02 and 12.04."  A.R. 21.  The ALJ then went on

explain this finding, discussing the "paragraph B" criteria of those two mental disorder listings,

including the level of Owens's restrictions with respect to activities of daily living, social

functioning, and concentration, persistence, and pace, and whether Owens had experienced

episodes of decompensation.  The ALJ then discussed the "paragraph C" criteria of those two

listings.  A.R. 21-22.[3]

Owens's argument on this point is not clear.  She appears to challenge the ALJ's

determination that she did not equal either of the mental disorder listings discussed in the opinion,

including the sufficiency of the evidence supporting that determination.  However, she does *not*

assert that she medically equaled listings 12.02 or 12.04 (or any other mental disorder listing).  In

her June 2016 pre-hearing brief, Owens asserted that her migraines and accompany symptoms

were equal in severity to the symptoms in listing 11.03, the listing for non-convulsive epilepsy

(discussed below).  *See* A.R. 303-304.  She did not make an equivalence argument with respect to

any mental disorder listing and does not do so in her motion.  Owens has not shown error, because

"[a]n ALJ is not required to discuss the combined effects of a claimant's impairments or compare

them to any listing in an equivalency determination, unless the claimant presents evidence in an

effort to establish equivalence."  *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).  Owens

"bears the burden of proving that . . . she has an impairment that meets or equals the criteria of an

impairment listed in Appendix I of the Commissioner's regulations."  *See Burch*, 400 F.3d at 683.

In the absence of any theory regarding how the specific criteria of any mental disorder listing is

met or equaled, Owens' assertion that the ALJ erred at step three with respect to the mental

disorder listings is without merit.  *See also Lewis*, 236 F.3d at 514 (finding ALJ did not err in

---

[3] Paragraph A of the two listings at issue specify the medical criteria that must be present in a claimant's medical evidence.  Paragraph B "provides the functional criteria [the SSA] assess[es] . . . to evaluate how [a claimant's] mental disorder limits [his or her] functioning."  Paragraph C "provides the criteria [the SSA] use[s] to evaluate 'serious and persistent mental disorders.'"  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

United States District Court
Northern District of California

concluding that plaintiff's conditions did not equal a listed impairment where he "offered no theory, plausible or otherwise, as to how his [impairments] combined to equal a listed impairment.").

Owens further argues that the ALJ erred at step three with respect to listing 11.03. As noted above, Owens asserted in her pre-hearing brief that her migraines and accompanying symptoms were equal in severity to the symptoms in listing 11.03, the listing for non-convulsive epilepsy, and discussed the evidence she argued established equivalency. A.R. 303-304. The ALJ's decision stated only, "I have considered all of the listed impairments, including sections 2.07, 3.03, 11.03, 12.02, 12.04, and 12.05. However, the medical evidence fails to support a finding that the claimant's medically determined impairments are attended by clinical findings, which meet or equal in severity the criteria of any listed impairment." A.R. 21. Owens argues in passing that "the ALJ's equivalence analysis is completely silent, even though the ALJ found both [migraines and vertigo] to be severe impairments," apparently referring to listing 11.03. Mot. 9.

Owens's pre-hearing brief was dated June 10, 2016. A.R. 301-305. On that date, the applicable version of listing 11.03 provided the following:

> 11.03 Epilepsy-nonconvulsive epilepsy (petit mal, psychomotor or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. § 11.02 Pt. 404, Subpt. P. App.1 (effective through Sept. 28, 2016). Listing 11.03 was the "'most closely analogous listed impairment' to migraine headaches." *Edwards v. Colvin*, No. 3:14—cv—05338—KLS, 2014 WL 7156846, at *3 (W.D. Wash. Dec. 15, 2014) (discussing listing 11.03 and Commissioner's policy guidelines; noting "defendant concedes the Commissioner evaluates migraine headaches under [listing 11.03]"). However, the SSA revised the medical criteria for evaluating epilepsy effective September 29, 2016, and the revisions rendered listing 11.03 obsolete as of that date. Listing 11.02, which is a single, consolidated epilepsy listing, effectively incorporates listing 11.03 at section B. The version of listing 11.02

that was in effect at the time of the ALJ's November 2016 decision was as follows:

11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

A. Generalized tonic-clonic seizures (see 11.00H1a[4]), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

B. Dyscognitive seizures (see 11.00H1b[5]), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

C. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once every 2 months for at least 4 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

    1. Physical functioning (see 11.00G3a); or
    2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
    3. Interacting with others (see 11.00G3b(ii)); or
    4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
    5. Adapting or managing oneself (see 11.00G3b(iv)); or

D. Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following:

    1. Physical functioning (see 11.00G3a); or
    2. Understanding, remembering, or applying information (see 11.00G3b(i)); or
    3. Interacting with others (see 11.00G3b(ii)); or
    4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
    5. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (effective Sept. 29, 2016-Jan. 16, 2017).

The ALJ's decision does not mention listing 11.02 and contains no discussion of

---

[4] The regulations state that "[g]eneralized tonic-clonic seizures are characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing causing the person to lose postural control) followed by a clonic phase (rapid cycles of muscle contraction and relaxation, also called convulsions). . . ." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

[5] "Dyscognitive seizures are characterized by alteration of consciousness without convulsions or loss of muscle control. During the seizure, blank staring, change of facial expression, and automatisms (such as lip smacking, chewing or swallowing, or repetitive simple actions, such as gestures or verbal utterances) may occur. . . ." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

equivalence with respect to 11.02's predecessor, listing 11.03. Notably, neither parties' briefing addresses listing 11.03's obsolescence or the listing that replaced it. In fact, the Commissioner's brief does not address Owens's argument that the ALJ erred with respect to listing 11.03 at all; instead, she discusses only the ALJ's determination that Owens did not meet or equal a mental disorder listing, addressed above. *See* Opp'n 4-7.

The court concludes that the ALJ erred with respect to considering whether Owens's migraines met or equaled a listing. As noted, the ALJ mentioned only listing 11.03, which was not in effect at the time of the decision. Moreover, the decision contains no explanation of how he concluded that Owens's migraines did not meet listing 11.03 or 11.02. The record contains Owens's testimony and reports to medical providers about a pattern of migraines occurring over a significant period of time. Specifically, Owens testified that she has migraines four to five days per week, each lasting "several hours." A.R. 51. During her migraines, Owens cannot "focus or pay attention . . ." A.R. 51. In a 2014 headache questionnaire, Owens stated that she first began experiencing migraines in May 2010 and had been prescribed three types of medication, two of which "just put [her] to sleep." A.R. 258-259. She also reported to Dr. Catlin that "her headaches are severe and frequent" and that during migraines "she is unable to leave her bed and will have to sit or lie in bed." A.R. 383. In addition to Owens's own reports, the record contains evidence of her history of migraines, including at least one visit to the emergency room and prescriptions for medications to treat her condition. A.R. 321-326, 331, 399, 555.

The ALJ did not discuss any of this evidence with respect to a listing, stating only that he considered listing 11.03 along with five other listings and that "the medical evidence" did not "support a finding that [Owens's] medically determined impairments are attended by clinical findings, which meet or equal in severity the criteria of any listed impairment." As Owens presented "evidence in an effort to establish equivalence," the ALJ was "required to discuss the combined effects of [Owens's] impairments or compare them to" the asserted listing in an equivalency determination. *See Burch*, 400 F.3d at 683. The ALJ's failure to do so was error. *See Lewis*, 236 F.3d at 512 ("A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not" meet or equal a listed impairment).

## C.     Credibility Assessment

Owens next argues that the ALJ erred in assessing her credibility.

### 1.     Legal Standard

In general, credibility determinations are the province of the ALJ.  "It is the ALJ's role to resolve evidentiary conflicts.  If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld."  *Allen v. Sec'y of Health & Human Servs*., 726 F.2d 1470, 1473 (9th Cir. 1984) (citations omitted).  An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5)(A)).  However, if an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so.  *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).  In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints."  *Id*. at 972 (quotations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.").  The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis.  20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281 (citations omitted).  First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82.  Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms.  *Bunnell v. Sullivan*, 947 F.2d 341, 345

(9th Cir. 1991) (en banc) (citation omitted).  Absent affirmative evidence that the claimant is malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The Ninth Circuit has reaffirmed the "specific, clear and convincing" standard applicable to review of an ALJ's decision to reject a claimant's testimony.  *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014).

### 2.    Analysis

The ALJ found that Owens's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Owens's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  A.R. 24.  As there was no evidence that Owens was malingering, the ALJ was required to provide "specific, clear and convincing" reasons for rejecting her testimony.

Owens asserts that the ALJ's credibility assessment failed to meet this standard, suggesting that the sole basis for the assessment was the statement above.  However, she does not address the ALJ's discussion of her credibility that appears later in the opinion.  Following the ALJ's statement that Owens's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record," the ALJ then discussed the medical evidence.  A.R. 24-26.  At the end of that discussion, the ALJ offered the following three reasons to discount Owens's "testimony and subjective allegations" about her "loss of functioning": 1) by Owens's own admission, she is capable of "significant activities of daily living, including no problems with personal care, ability to prepare simple meals, ability to shop in stores, ability to clean her house and do some yard work and ability to feed the dog"; 2) Owens recently started working for Amazon in May 2016 on a full time basis, demonstrating her ability to engage in work activity that may be at the substantial gainful activity level; and 3) Owens was "able to focus and pay attention during the hearing for every question."  A.R. 26-27.  Owens does not challenge any of these reasons as not satisfying the "specific, clear and convincing standard"; in fact, she does not acknowledge any of these reasons

in her motion. The court concludes that the ALJ did not err because he provided specific, clear and convincing reasons for discounting Owens's testimony.

### D. Evaluation of the Medical Evidence

Owens argues that the ALJ erred with respect to weighing the medical opinion evidence.

#### 1. Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id*.

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot

constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244. An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

Owens makes two arguments with respect to the ALJ's weighing of the medical opinions. First, Owens notes that the ALJ assigned "partial weight" to the opinions of examining physicians Dr. Howard and Dr. Catlin and "partial weight" to the opinions of the reviewing physicians, Dr. Klein and Dr. Barrons. A.R. 25-26. According to Owens, the ALJ's failure to give controlling weight to any of the medical opinion evidence was error because he "improperly substituted his own medical judgment in lieu of the judgment of the psychologists who were qualified to assess Plaintiff's medical impairments." Mot. 11. Owens does not explain this argument in any detail. She also offers no support for the proposition that the ALJ was required to adopt in full or assign controlling weight to any medical opinion in the record. The court finds no error with respect to this aspect of the ALJ's opinion.

Owens also challenges the ALJ's rationale for assigning partial weight to each of the medical opinions. Specifically, she asserts that the ALJ offered "nearly identical rationales" for doing so; namely, that the opinions of Drs. Howard and Catlin "appear[ed] to rely heavily on the claimant's subjective complaints" and were "not consistent with the record as a whole." She also notes that the ALJ gave partial weight to the opinions of Drs. Klein and Barrons because each was "not consistent with the record as a whole." Mot. 11-12 (discussing A.R. 26). Owens also asserts

that because the ALJ failed to state which aspects of each opinion he credited and which he rejected, his "findings regarding the opinion evidence are not based on substantial evidence." *Id*. at 12.

As with her first argument, Owens does not explain her position in any detail. While she correctly notes that the ALJ offered the same or similar reasons to discount each of the medical opinions, she does not actually challenge the sufficiency of the reasons offered or argue that they do not meet the applicable standard. She also does not identify any specific aspect of the opinions that she contends deserves greater weight. Accordingly, the court concludes that Owens has failed to show error with respect to the medical opinions.

### E. RFC Assessment

Finally, Owens argues that the ALJ's RFC finding and corresponding VE testimony that a person with her RFC could perform jobs that exist in significant numbers in the national economy was not based on substantial evidence.

The ALJ found that Owens retains the following RFC:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant must not work around moving mechanical parts and unprotected heights; can perform simple, routine, repetitive tasks, but not at a production rate; can make simple work-related decisions; can occasionally interact with supervisors; can occasionally interact with coworkers, but not in a tandem/team/group setting; cannot have any interaction with the public; and must work in a stable work environment, meaning few changes, if any, in the day to day work setting and in the tools and/or work processes used to accomplish tasks.

A.R. 23.

First, Owens notes that the ALJ's RFC states that she "can perform simple, routine, repetitive tasks, but not at a production rate." She argues that the two occupations identified by the VE, cleaner and harvest worker, are not consistent with the limitation "not at a production rate." While acknowledging that the descriptions of the two positions in the Dictionary of Occupational Titles ("DOT") does not discuss or mention production rate, she contends that "it defies logic to think that any job is not quantified at all" and appears to contend that the VE's testimony conflicted with the DOT. Mot. 15. Owens's argument is not persuasive. "For a

difference between an expert's testimony and the [DOT's] listings to be fairly characterized as a conflict, it must be obvious or apparent. This means that the testimony must be at odds with the [DOT's] listing of job requirements that are essential, integral, or expected." *Gutierrez v. Colvin*, 844 F.3d 804, 808 (9th Cir. 2016). As Owens admits, the occupations identified by the VE contain no explicit production quota. The court concludes there was no conflict between the VE's testimony and the DOT.

Next, Owens argues that the ALJ erred by failing to indicate which portions of the medical evidence support his RFC finding. As with much of her motion, Owens does not explain this argument in any detail or provide any authority supporting her position. In determining a claimant's RFC at step four of the sequential analysis, an ALJ must consider "all of the relevant medical and other evidence" in the record, 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c), and must consider all of the claimant's "medically determinable impairments," including those that are not severe. 20 C.F.R. § 404.1545(a)(2); *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "[A]n RFC that fails to take into account a claimant's limitations is defective." *Valentine v. Comm'r. of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). Owens does not contend that the ALJ erred with respect to any specific limitation(s), and does not take issue with any portion of the RFC. She also does not offer any authority supporting her claim that the ALJ was required to identify the specific medical evidence supporting the RFC finding. The court finds no error on this point.

Finally, Owens argues that the RFC failed to account for Owens's testimony that she missed about 12 days of work with Tanko Lighting during a 90-day period due to migraines. *See* A.R. 57-58. She notes the VE's testimony that it would be "totally unacceptable" for a person in the cleaner or harvest worker positions to miss work one or two days per month, and that an employer might be willing to tolerate "one or two days a year" of absences. A.R. 71-72. The court concludes that the ALJ erred on this point, because he did not resolve the inconsistency between Owens's testimony about the amount of work she missed in her last job and the VE's testimony about the maximum number of absences that might be allowable in the occupations identified. To the extent the ALJ rejected that portion of Owens's testimony, the decision does not so state and does not offer specific reasons why she was not credible on that particular point.

## VII.   CONCLUSION

For the foregoing reasons, the court grants in part Owens's motion for summary judgment and remands this matter for proceedings consistent with the opinion.

**IT IS SO ORDERED.**

Dated: September 3, 2019



Donna M. Ryu
United States Magistrate Judge
Judge Donna M. Ryu